*230 Saturday, April 16. The Judges delivered their opinions.
Judge Tucker.
Colquhoun and others brought a suit in the H. C. C. against the Auditor for the value of certain tobacco purchased by them, the notes for which they had; but on application for the tobacco itwasnot delivered, having been embezzled, as was alleged, by one of the inspectors, both of whom were insolvent. Upon a demurrer to the bill the Chancellor decreed that the Commonwealth was liable for the tobacco thus embezzled. The Auditor appealed.
On the part of the Commonwealth it is contended,
1. That according to the true interpretation of the tobacco-laws the Commonwealth is- not liable for the misconduct of the inspectors, in case of insolvency.
2. That she cannot be made liable in any case where she is not expressly made liable by those laws.
On the part of the appellees it is contended,
That the Commonwealth is liable for the misconduct of the inspectors in the same manner that any common bailee of goods is, or may be liable for the misconduct of his agents and servants.
The laws for the inspection of tobacco made at several periods in this country, have had for their object the improvement of that staple commodity, and the benefit and security of all that make, or deal in it. The planter is secured from participating in the loss, whiph might otherwise be sustained by the whole community, in consequence of the fraudulent, or slovenly conduct of unprincipled men, who might wish to put off mere trash for a valuable commodity ; the merchant on the other hand is equally secured against these frauds; and purchases with confidence on the evidence of the tobacco-note, that the commodity is sound and merchantable. Laws made with a view to these objects must be compulsory, must be penal in order to., be beneficial. Numerous are the penalties which they *231 impose upon the planter, the inspector, the masters of vessels and of crafts attempting to violate, or evade the regulations they prescribe : all of them ultimately tending to the security of the merchant. From the year 1730, to the present time, the same system, with occasional amendments, appears to have been invariably pursued ; and the remedy given against the inspectors for not delivering tobacco, according to the notes, has from that period to the present, been precisely the same. In the year 1732, an act passed, (probably occasioned by some recent event) for indemnifying inspectors against their notes, in cases where the warehouses might be burnt, and in 1748, the Assembly engaged to make good all losses arising from such accidents. In 1769, the title of an act occurs (a) to appoint commissioners tosíate and settle damages done by the late storm, in several warehouses : and in 1771 (b) one for the relief of the sufferers by the loss of tobacco damaged, or burnt in several warehouses. In May, 1782, an act passed to ascertain the losses and injuries sustained from the depredations of the enemy within this Commonwealth,(c) one of the objects of which I believe (for I have not the act itself to refer to) was, to recompense those who sustained losses by tobacco burnt in the warehouses.
Notwithstanding the special acts made at different times, we find no general provision in any subsequent law, to recompense the sufferers on future occasions of the like kind, the Legislature seeming to reserve them to be acted upon by their own body, occasionally. “ The case of embezzlement no doubt appeared to them to be sufficiently provided against by the high penalty of double the value, imposed by the 21st sect, of the act 1792, c. 135. on any inspector who should fail or refuse to deliver any hogshead of tobacco, when demanded for exportation. The remedy was probably commensurate to any offence which the Legislature could imagine might happen, within the space of a year, or perhaps a few months, weeks, or days; since the warehouses were always to be open for the application for *232 and. delivery of tobacco. And a single instance of failure or refusal would lead to general alarm, and instant detection ; in which case the law had provided a summary method of removing the delinquent inspector from his office. The extreme case of an extensive peculation, and total insolvency on the part of both the inspectors, was probably not foreseen, and certainly not provided for by the Legislature. I am, therefore, upon this point, most clearly of opinion, that thei*e is nothing in the tobacco law itself which entitles the appellees to redress against the State for the loss they have sustained; there being a specific remedy provided by that law, for this very case, which, although it may happen, in the present instance, to be inadequate, is the only remedy which the law gives. This brings me to the second point:
Whether the state can be made liable, in any case in which the Legislature have not expressly declared she shall be liable ?
It was strongly urged by the appellees’ counsel that the act declaring that a petition to the H. C. C. or District Court of Richmond\ shall be allowed to all persons entitled to demand against the Commonwealth any right, in law or equity ;(a) placed the Commonwealth in those Courts, upon the same footing, precisely, as any other defendant. This is certainly true, I conceive, as to the remedy in all cases within the provisions of the laws, or constitution of the State ; but ought not to be interpreted in such a manner as to go beyond the limits which the laws and constitution, prescribe. Neither a Court of Law, nor a Court of Equity can carry a statutory remedy further than the statute allows, nor supply a casus omissus in any statute. And if the remedy given by a statute against A. be inadequate, or happen to fail, I know of no rule of law by which B. can be held liable, unless the statute expressly declares that he shall be so, if A. be unable to make satisfaction. But it is argued that there is a moral obligation upon the State to indemnify all persons against the msiconduct of the inspect*" *233 ors, as well as an express one, contained in the act, to indemnify those who may be sufferers in case of fire : and that this Court has power to decree the performance of that moral obligation. This doctrine, I apprehend, is contended for upon too broad a ground; there are numerous moral obligations which a State may contract towards its own citizens, which it will not be pretended that this Court is competent to decree the performance of. Allegiance and protection, for example, are reciprocal duties, and create a moral obligation upon the State, either to afford protection to the citizen, or to indemnify him, as far as the nature of the case will admit, for his losses: the house of a citizen is burnt, his slaves and his crops carried off by enemies, and himself maimed for life, in a conflict with them. The State was bound to have protected him against all enemies : Can this Court remunerate him for the loss ■of his house, his slaves, his crops, or his limbs ? Certainly not, unless there be some statute made for that express purpose, nor, even in that case, beyond the measure of compensation which the statute allows. The mere establishment of a tribunal to which all persons entitled to demand against the Commonwealth any right either at law or equity, may resort, does not authorise that tribunal to overstep the bounds of legal right, or of such equitable rights as are within the reason, though not within the -words of the law upon which legal rights are founded; moral rights, beyond these limits, must be referred to the Legislature.
The undertaking on the part of the State to insure all persons against the misconduct of inspectors has been inferred from a variety of circumstances ; The negotiability of tobacco-notes ; their being receivable in taxes, and in discharge of executions. All these are circumstances growing out of the relative state of commerce, at the time those laws were made, but do not, I conceive, impose any obligation upon the State ; they were all in fact, calculated for the benefit of the merchant in their final operation. His remittances were to be made in that article, and every fact- *234 lity to enable him to do so, was provided by law. His debt-. orIhig'ht pay him fifty, a hundred, or five hundred pounds of tobacco — -instead of receiving the specific tobacco in these small parcels, an inspectors note was offered him ; and w]len lle had as many of those small notes, as would enable him to fill ahogshead with the tobacco itself, the inspector for a moderate premium was bound to collect it from the various parcels in his. care, and have it packed, and in due prder for exportation. I can discover no moral obligation upon the State, arising from these circumstances.
But the warehouses are said to belong to the State ; this is a mistake ; they belong to private persons, who receive either a stated rent per annum ; or storage at the rate of 25 pents per hqgshead, for one year, and five cents per month afterwards, to be paid by the shipper : If the owner of the ground where the warehouse is proposed to be established^ refuses to build one, in that case, indeed, the warehouse Is to be built at the expense of the public : but that was not the case in this instance, and it is believed there are few or. none where it has been done. The inspectors are considered also as the special agents of the State, acting for its benefit, and emolument; and from hence the State is considered in the light of an ordinary bailee of goods, and as responsible for the fraudulent conduct of those agents.
Upoii the mast mature consideration, I cannot distinguish the inspectors of tobacco from other public officers. If a sheriff take goods, slaves or chattels in execution, is the State liable for his peculation, although (as has happened in some counties) the sheriff and his securities should all prove insolvent, or run out of the State ? no one will pretend it. If the clerk of a Court loses a will, a deed, oy a record, and by negligence has his office burnt and destroyed, is the State'liable for his misconduct ? This is not pretended. Why .then, is the State liable for the misconduct of an inspector Because, say the counsel for the appellees, the State draws a revenue from the tobacco. How - ever that fact may be, it does not constitute any part of the *235 record in this case, and it Would be equally indecorous, and against the tule of proceeding in an appellate Court to travel out of the record in quest of reason for holding the State responsible ; on the contrary we are bound to presume the reverse ; for since the constitution of the United Slates prohibits any State from imposing any duty on exports, except what may be absolutely necessary for executing its inspection laws, without the consent of Congress, we are bound to presume (in this case) that the State has hot been guilty of an infringement of that article of the federal constitution. And although there may be án excess in the hands of the State at present, a single fire might transfer the balance to the other side. Such an excess (if it exists) may furnish the appellees with a reasonable ground to apply to the Legislature for their indemnification : but as the fact does not appear Upon this record ; it has nothing to do With the present question.
By the 37th sect. of the tobacco-law, if any of the warehouses therein mentioned shall happen to be burnt, the loss sustained thereby shall be made good, and repaid, to the several per sons injured, by the General Assembly, This clause Is in the nature of a compact on the part of the State, and this Court, in such a case; might be authorised to decree a specific performance of it, utider the act which allows a petition to the High Court of Chancery* But what if it should appear that the the tobacco burnt had been permitted to remain twelve months' in the warehouse after the date of the receipt. The owner or proprietor of it must bear the . loss and not be paid for it by the public. Here the terms of the compact are changed, according to the circumstances of the case — nor could a Court of Equity vary the obligation which the State has contracted voluntarily, in the smallest respect. Neither can it extend the obligation to any other case of accident but that of fire 5 that being the only one provided for by the law.
Upon the whole of this case, I think the State is not liable; and therefore, that the decree ought t» be reversed, and the appellees’ bill dismissed.
*236 Judge Roane.
The principal object of the acts regulating the inspection of tobacco, is, to preserve the purity of that staple. This is evident, as- well from a general review of them, as from the second section of the act of 1654 ;(a) an act,, the principal provisions of which are kept up in the modern laws upon this subject, almost verbatim ; although, for the sake of brevity, the declaration in that section is omitted in the act of 1792, on this subject.
That section declares, that “ for the more effectual pre ‘‘ venting the exportation of trash, bad, unsound, and un- “ merchantable tobacco,” all tobacco which shall be exported, shall be first inspected according to the directions of the act. This important purpose is not the less the great object of the policy of the act, because, as incidental thereto, and depending thereupon, another beneficial purpose is effectuated thereby — namely, that the receipts for the tobacco during its continuance in the several warehouses, are made to answer some of the purposes of cash. This-latter, however, is certainly an incidental consequence, and is no where declared to be the primary object of the act» Notwithstanding this latter provision also, in relation to the currency and qualities of tobacco-notes, during their existence and circulation, it is clearly the object of the act, that the tobacco should remain but a short time in the several warehouses. This is evident from the provision,(b) that the County Courts are to provide, from time to time, warehouses having sufficient room to contain two-thirds, only, of the tobacco which will be annually brought there, which at an average is only equal to a deposit of eight months’ continuance ; from the provision that tobacco of more than twelve months’ continuance irr the warehouse shall not be paid for by the public, if burnt,(c) and from the regulation respecting the sale of old tobacco.(d) Add to this, that it could not have been rationally expected that that commodity would have generally remained long on hand, without yielding interest or profit, which at the epoch of the *237 enaction of our first inspection laws, formed almost the only article of export from this country. It is also a fact well known, that the tobaccoes are generally prepared and carried to the inspection during the winter or spring seasons, and are usually exported from this country-in the spring or summer. I mention these things to shew, that neither the Legislature nor the people contemplated a long continuance of the tobaccoes in the public warehouses; a circumstance winch will have its due weight in forming a just construction upon this subject.
This was not only not contemplated, but even if it were,, it is better for the planters and those claiming under them, (admitting the irresponsibility of the government in the case in question, and laying no stress, at present, upon the great convenience and accommodation resulting to them, from the creation and currency of tobacco-notes,) that their tobaccoes should remain in secure warehouses and under the care of officers of great integrity and responsibility, than in any private hands whatsoever. Be this matter, however, as it may, the planters are under no obligation to carry their tobaccoes to be inspected, until it is intended to be exported; neither they nor those who claim under them are compellable to retain it there a moment after it is inspected, but may immediately cause it to be exported ; (at tbe same time it is to be remarked, that it would have entirely defeated the object of the inspection laws to permit the planters, after inspection, to take away their tobaccoes, for any other purpose than that of exportation;) and they may choose, throughout the whole State, that warehouse which.appears to them the most secure, and those inspectors whom they deem the most upright and Worthy of confidence. It will presently be seen that the Legislature has been very vigilant to insure the existence of the one and the other.
The primary object of the inspection acts being, as I have supposed, at all times the preservation of the purity of the staple, it perhaps never was intended to derive a re-* venue from the system : at any rate, it neyer was intend *238 ed that the State should receive any reward for keeping hi' its warehouses a commodity which, (I have already endeavored to shew) it was wished and expected should be ta^en therefrom as soon as possible ; and accordingly a review of the inspection system will shew, that the taxes and duties imposed upon the inspection of tobacco are only equal to, as they are intended, to,defray the necessary expenses of the institution. But however this might formerly have been, there exists no doubt upon the subject at this day ; the constitution of the United States, art. 1. sect. 10. having declared that “ no State shall, without the consent “ of Congress, lay any imposts or duties on imports or ex- “ ports, except what may be absolutely necessary for exec u- “ ting its inspection laxosf and that all such laws shall be subject to the revision and controul of the Congress. As our present inspection laws passed since the adoption of .this constitution, we cannot construe the duties imposed on the inspection of tobacco to be a reward to the State, for the safe keeping of the article, without imputing to the Legislature the wantonness of imposing a tax on our people which it is immediately compellable to pay over to the general government. The State of Virginia, therefore, receives no reward for keeping the tobaccoes of the people, and in truth wishes them to be kept on hand no longer, than the convenience of the citizens and interests of commerce should be found to require.
In the establishment of the inspection system, however, it was found necessary that certain officers should be appointed who do receive a r exoar d for this among other services. That rexvard is found to exist in the salaries, paid to the several inspectors, and in consideration of which the doctrine of bailment will (as to them) undoubtedly attach. As to the Commonwealth, however, no reward or salary is received by it for the services in question, and the taxes paid upon the inspection of tobacco (however they furnish a salary to the individual inspectors) can only be considered as “ duties absolutely necessary for the execution of the *239 u inspection laws.” In this view therefore the doctrine of bailment would not, as to the Commonwealth, naturally attach.
Although the salaries of the inspectors are paid by the Commonwealth, it is not doubted but that they enure to the benefit of every person aggrieved by their breach of duty, so far as the principles of law or the positive provisions of the act, will go to charge them. It is admitted on all hands, (and accordingly the appellees have tried their remedy at law,) that those principles and provisions will go to charge the inspectors, in the case of an embezzlement: But the question here is, whether the Commonwealth be also liable in the case which has happened.
On general principles, if it was not contemplated nor expected, that the tobacco would remain long in the warehouses, there is the less reason for adopting a construction making the State liable, than if (as was argued) it was the principal object of the act to procure a permanent and compulsory deposit'of this commodity for the purpose of creating a circulating currency : In other words, a system whose principal object was the safe keeping of articles for hire, ought naturally to yield a better security for their safe return, than one where the deposit is for another purpose, and where the custody of the article is merely transitory and incidental. It is now to be seen whether the particular provisions in and constructions arising out of the act in question, support or overrule this principle in the case before us ; nq position being more clear than that “ modus et conventio vincunt legem?
By the act of 1792(a) four persons are to be annually nominated by the County Courts as inspectors at each warehouse, out of whom the executive are to select two, and each inspector shall annually renew his bond. The short duration of these appointments, the circumspection used in selecting the officers, and the great respectability of the County Courts, as well as of the executive, (which Courts are also intimately acquainted with the characters of t^e in-s *240 dividuals recommended,) give a sufficient assurance that men of character and integrity will generally be appointed. Various checks are also provided against misconduct on the part of the inspectors. By the 36th section of the same act,(a) two justices are empowered to hear complaints, against inspectors, and take depositions and send them on to the executive touching any breach of duty, who may instantly remove such inspectors, and they are moreover declared to be liable to the action of the party grieved for all loss arising from their failure or neglect of duty. A similar provision is made by an act of 1796,(b) whereby commissioners are required to visit the warehouses once in s.ix months, and (inter alia) see that the inspectors in all things diligently discharge their duty. By the act of 1792(c) the inspectors are annually to lay before the several County Courts the quantity of tobacco inspected, and the condition of the zvarehouses, and the Courts are required to cause (adequate repairs to be made if they are not satisfied that the warehouses are properly secured. These provisions (and perhaps others might be found) have for their direct object, the sufficiency of the warehpuses, and the continuance of the integrity of the, inspectors : they are. such as the justice and policy of the government would equally provide, in furtherance of the 'great object of the system, in the idea that the several inspectors were alone- liable, as under a contrary supposition. The inspectors also take an oath(d) diligently to view all tobacco, &c. not to pass unsound tobacco, &c. nor to refuse any that is sound and merchantable, &c. and in all things well and faithfully to discharge the duty of inspector, according to the directions of this act. They are also each of them to give an annual bond in the penalty of 4,000 dollars payable to the governor and his successors, with condition for the true and faithful performance of hi? duty according to the directions of this act.(e) The form of the receipt for the tobacco, signed, by the inspectors, is, that it shall be “ delivered by us for “ exportation when demanded,” (f) and they are declared *241 hable to u penalty of double the value of any tobacco refused to be delivered to the owner presenting the note and demanding it for the purpose of exportation.(a)
The inspectors’ bonds, of which there are two given with good security, annually, at each warehouse, I presume enure to the benefit of persons whose tobaccoes are embezzled. I consider that this is the case because the condition thereof, as well as the oath, is to perform their duty according to the directions of the act, one of which directions is, to deliver out all tobacco when demanded for exportation. A person whose tobacco is embezzled and, refused to be delivered when demanded for exportation, is a person injured within the meaning of the act, and has, ex debito justicia, a right to put the bond in suit. The case of the Archbishop of Canterbury v. House,(b) recognized and approved by this Court in the case of Braxton v. Winslow,(c) seems to establish this principle in an analogous case. The omission in the act of 1792, of a positive declaration (which is unnecessary under the decisions just mentioned) that the bond may be put in suit by any party injured, &c. (as is the case in relation to some other public bonds,) and the provision in the 14th section, p.257. that the bond after being recorded in the county shall be transmitted to the treasurer, who shall move against every in spector failing to discharge the same, seems Insufficient to oust individuals of the benefit of suing on the bond, who bring themselves entirely within the meaning of its condition, and are consequently entitled, ex debito justicia to bring suit thereupon. It is not a natural construction that a bond whose condition is, expressly, commensurate with all the duties prescribed by the act, should be held to extend to one duty only ; that of paying into the treasury the money due to the Commonwealth ; the words just mention, ed “ failing to discharge the same” can be satisfied without producing this effect, under the principle referenda singula singulis.
*242 If the two bonds annually given by the inspectors at each warehouse, enure to the benefit of individuals in cases like the present, it would seem that the penalties thereof would generally be sufficient to cover the defalcations aris;ng within the respective years. But even if it be otherwise, it is probable that the liability to pay double the value of tobaccoes embezzled, to the extent of the inspectors’ whole fortunes, would (under the great caution used too to procure upright inspectors and secure warehouses) afford a sufficient guarantee to the owners of tobacco ;• perhaps a much better than could generally be found in the hands of other individuals. When we add to these; considerations not only the option the planters have as to particular inspectors and wax-ehouses, but also that the inspection system undoubtedly enhances the price of the commodity, the benefits resulting to the owners of tobacco are sufficiently great even under the construction contended for on the part of the Commonwealth.
It is true that the act in question while it is profuse in declaring the liability of the inspectors in cases like the present, does not declare, totidem verbis, the exemption of the Commonwealth from l-esponsibility. This would have been supererogation, in consequence of the- general considei-ations before mentioned, and particularly from the non-existence of a reward on the part of the Commonwealth, without which the doctrines of bailment do not regularly attach. The sense of the Legislature, however, on this subject may be sufficiently collected from the act. lit the 3'flh sect, of the act of 15(92, p. 267. it is provided that if any warehouse herein mentioned shall happen to be burnt, the loss thereby sustained shall be made good by the General Assembly, and in case of such accident no inspector shall be sued or molested for or by reason of any receipts by them given for the tobacco so burnt, but shall be altogether acquitted or discharged of and from the payment of the tobacco mentioned in such receipts, any thing herein before contained to the contrary notwithstanding. Under the *243 principle, that expressio unius est exclusio alter ins, this is equivalent io a declaration on the part of the Legislature that in ether cases the Commonwealth shall not be held responsible. It is said too that the loss shall be made good by the- “ General Assembly,” thereby indicating that even in that case a recourse shall not be had against the officers of the Commonwealth in thé ordinary way, but whensoever siich loss shall happen the faith of the Commonwealth is pledged that the Legislature shall make it good by a particular act to be passed for that purpose*
Thus it seems to be the true construction of the act, that in case of this “ accident,” (and also, in that mentioned in the argument, of the loss produced by a great fresh, and perhaps in some others,) which no care, integrity nor prudence on the part of the inspectors could possibly have averted, the Commonwealth should be bound to indemnify the owners ; leaving them at the same time to be recompensed by the inspectors for all losses of a contrary character, to be made good by them in consideration of the reward paid to them for their services.
I am therefore of opinion that the decree should be reversed, and the bill dismissed.
Judge Fíemung.
It is sound policy in every commercial country to take care that their several articles of exportation be of a good, sound, merchantable quality; and under this impression, our Legislature have from time to time judged it expedient to pass laws for the inspection not only of tobacco, but of bread, flour, meal, fish, pork, beef, hemp, tar, pitch, turpentine, and even lumber; and tobacco being the principal staple of our country, the greater part of which is annually exported to foreign markets, it was a great object of qur Legislature that its quality should, be equal, if not superior to that carried to market from other countries ; that it might command a better price i hence the act commonly called the “ tobacco-laxvf which has been varied from time to time, as circumstances seem *244 ed to require, is more diffuse, and embraces a greater da*' ricty of objects than any other act on the subject of inspection ; by the first clause of which it is enacted “ that no to- “ bacco shall be shipped or exported, but in hogsheads or “ casks of a particular description, carried to some public “ warehouse, and there inspected by men specially ap u pointed for that purpose.” This law, with occasional variations,- has, on the experience of near a century, been found very beneficial, as well to the cultivators of tobacco, as to the community at large* for whose general emolument it was originally instituted ; but not for the purpose of raising a revenue, as was contended in the argument, by the counsel for the appellees ; though, from the present judb cious regulations, it may bring a small sum annually into the treasury.
It is not contended but the Legislature had a constitutional right to pass the law: thatbeing admitted, it follows of Course that they had a right to do it under such regulations and modifications as- to them, from time to time, seemed expedient, aiicl most likely to be beneficial to the community at large: but it by no means, as I conceive, placed the Commonweahhjjinthe state or condition of a common bailee,-and made it responsible for all the losses that might be sustained by the owners of tobacco in'the several warehouses.
By the 37th sect. of the act of 1792 (as was done in ma -- ny of the former acts) it is provided that where a warehouse shall happen to be burnt, the -loss sustained thereby shall be made good by the General Assembly, and the inspectors indemnified: but further the Legislature did not go-«--reserving-to themselves the discretion of making compensation for all other losses, or not,- according to circumstances, by special provision; as was done, I believe for the losses sustained by the great fresh, in the year 1771, and on several ether special occasions.
The law requires(a) that every person appointed an inspector of tobacco shall, before entering upon the duties of his office, give bond with good security, in the penalty of *245 f 000 dollars, for the faithful performance of his duty3 which the Legislature, no doubt, thought a sufficient sum t& rover the delinquency and malfeazunce of any one inspector 3 fhoughin this singular instance, it seems, they were mistaken.
It seems a hard case on the appellees, but they must seek relief from another quarter.
The decree was rev ersed, and the bill dismissed with costs.(1)

 Ed. 1785, p. 16.

 Ib. p. 20.

 Ib. l58,

 L. V. 1794, c. 85. sect. 5.

 Ed. 1769, p. 420.

 Rev. Code, vol. 1. c. 135. sect. 4 & 5. p. 254.

 P. 267. sect. 37.

 P. 263. sset. 28.

 Rev. Code, vol. 1. c. 135, sect. 11. p.256.

 P. 266.

 Ib. p. 365.

 Sect. 5. p, 254.

 P. 257. sect. 14.

 Ibid.

 Ib. sect. 16.

 P. 261, sect. 21.

 Cowp. 140.

 1 Wash. 31

 Act of 1792, sect. 14.

 The Commonwealth, when the decision is in its favour, recovers costs ; though it does not pay costs, when cast in a suit.